## METROPOLITAN LIFE INS. CO. v. FUNDERBURK.

### No. 2689.

Court of Civil Appeals of Texas. Beaumont.
April 4, 1935.

Rehearing Denied March 10, 1935.

Vinson, Elkins, Sweeton & Weems, of Houston, for appellant.

W. T. McNeill, of Beaumont, for appellee.

COMBS, Justice.

Appellee was plaintiff and appellant defendant in the trial court.

As an employee of Magnolia Petroleum Company, W. O. Funderburk was insured by the defendant under a group policy which entitled the plaintiff, as his beneficiary, to $1,600 in case of his death from any cause, the contract providing also for a double indemnity in the event the insured's death should result "directly and independently of all other causes" from bodily injuries sustained solely through violent, external, and

"accidental means." It was further stipulated by way of exception that such double indemnity insurance should not cover "death or other loss caused wholly or partly by disease or bodily or mental infirmity." On August 1, 1932, while working inside the dome of an oil tank car, insured suffered a heat stroke and died the same day. The defendant paid to Mrs. Funderburk $1,600, the amount of its liability for nonaccidental death, but denied liability for double indemnity, contending that insured's death resulted partly from disease or bodily infirmity. This suit followed, and on a trial to a jury resulted in a judgment in favor of plaintiff for $1,600 as for accidental death, plus statutory penalty of 12 per cent. and $400 attorney's fee. The penalty and attorney's fee features of the judgment are not complained of.

It is not disputed that the deceased suffered the heat exhaustion, nor does the defendant deny the general proposition that death from heat exhaustion is "accidental." Its contention here is that plaintiff failed to bring her claim for double indemnity within the provisions of the contract in that, as it contends, the evidence failed to raise the issue that the deceased's death resulted solely and independently of all other causes from the heat exhaustion.

Therefore, the controlling question, presented by appellant's first four propositions, is the sufficiency of the evidence to sustain the jury's affirmative answer to the following issue: "Do you find from a preponderance of the evidence that the death of the deceased, W. O. Funderburk, resulted solely, directly and independently of all other causes from the heat exhaustion which he sustained?"

The facts bearing upon the issue, so far as necessary to recite here, are as follows: Mr. Funderburk was fifty-five years of age. He was employed as a riveter and caulker and had been so employed for some eight years. He was an active, energetic worker. On the morning of his death he came to work at the usual time, and appeared to be cheerful and in good health; he went to work with an air riveting machine inside the dome of an oil tank car; because of the narrow space in which he had to work he was required to work in a cramped position. After using the riveting hammer for some time, he came out of the car and changed that tool for a caulking tool, which operated from the same air line, and went back inside the dome of the car and resumed work. After having worked altogether for some hour and a half, his

fellow employee noticed that his machine had stopped work. He went to the car to see what the trouble was and Mr. Funderburk had come out of the car and was standing on the ground leaning against the running board; he was very pale and apparently in pain. The workman said to him, "You have got too hot," and he said, "Yes." He was sent to the emergency station where treatment was administered to him by a doctor and nurses. As shown by the medical testimony, he was suffering from heat exhaustion, the symptoms being typical of such condition. He was later removed from the emergency station to his home where he developed convulsions and his death followed in a few hours.

On the same day, but after the body was embalmed, Dr. H. B. Williford, a pathologist, performed an autopsy. As shown by his testimony, his findings were: (1) Generalized arteriosclerosis, (2) Chronic fibrous myocarditis, (3) Fatty infiltration of the heart, (4) Coronary sclerosis, (5) Aortic atheromata. Dr. Williford had never examined Funderburk during his lifetime and did not know him, but based upon the autopsy he said that it indicated to him that deceased was a man of inferior ability; that usually a man suffering from such conditions as he found to exist would endanger his life by exerting or straining. Dr. English, company physician, was present during the autopsy. Dr. English also testified that he had made a routine examination of Funderburk some time before his death and that his blood pressure was high. He did not recall just when the examination was made and he appeared to have no record of it. It was the opinion of these doctors, witnesses for defendant, that the conditions disclosed by the autopsy contributed to the death of the deceased by rendering him more susceptible to death from heat exhaustion. Both admitted on cross-examination that a normal man might die from heat exhaustion such as that suffered by the deceased, but stated that it was not the usual thing.

Dr. L. C. Powell, a witness for plaintiff, testified that it depended altogether on the extent of impairment as to whether the conditions described by the pathologist contributed to Funderburk's death; that it was possible for a man to live to a ripe old age with all of the conditions present which were described by Dr. Williford; that hardening of the arteries, for instance, is a natural concomitant of advancing age and is present to a greater or less extent in all persons past middle life. Mr. Keith Hotchkiss, an under-

taker and embalmer, who testified that he had had two years of college study in pathology and had assisted in the performance of some seven hundred autopsies, testified that the embalming fluid, by its chemical action would produce a hardening of arteries identical with that produced by arteriosclerosis and that many embalming fluids would produce deposits in the tissues identical in appearance with calcium deposits; and that only a chemical analysis would reveal the difference.

The widow testified that Mr. Funderburk had been hale and hearty and active, had not complained of dizziness, nervousness, or sleeplessness or any of the conditions which the medical testimony showed naturally accompanies the existence of the physical infirmities described by the pathologist when they exist in an advanced or dangerous degree. The testimony of Mr. Funderburk's fellow workmen showed without controversy that he had been an active energetic worker, and that on the occasion in question he had been doing the heavy work of a riveter and caulker in the tank car for an hour and a half before he was overcome by the heat exhaustion. A temperature reading taken in the car in which he worked something like an hour after his stroke showed the temperature at the bottom of the tank car to be 112 degrees and in the dome 114 degrees Fahrenheit. There was, of course, a lack of circulation of air in the tank and the facts fully warrant the conclusion that a perfectly well and normal man might have suffered heat exhaustion and death as a result of working under the conditions under which Funderburk worked on the morning of his death.

■ We think the testimony ample to sustain the jury's finding that the death of the deceased did result solely, directly, and independently of all other causes from the heat exhaustion which he sustained. The rule is now well established that the burden of proof was upon the plaintiff to plead and prove that the death of the insured was occasioned by accidental means and that it did not come within the exception named in the policy. Washington Fidelity National Ins. Co. v. Williams (Tex. Com. App.) 49 S.W. (2d) 1093; Travelers' Ins. Co. v. Harris (Tex. Com. App.) 212 S. W. 933; American Ins. Co. v. Maddox (Tex. Civ. App.) 60 S.W.(2d) 1074. But we think the plaintiff fully met the burden of proof resting upon her.

■■ Appellant insists that the testimony of the pathologist as to his findings, and the testimony of himself and Dr. English that the conditions which he found contributed to the death of the deceased constitute not mere opinion evidence but instead amount to statements of fact; that such evidence is without contradiction; and conclusively establishes that the death of the deceased was caused in part by disease or bodily infirmity. The contention is without merit. Such testimony was not in the nature of fact testimony but necessarily embodied in each instance the opinion and conclusion of the witness. Thus when the witnesses stated that the hardening of the arteries and the presence of calcium deposits in the tissues was the result of arteriosclerosis they but stated their opinion. The undertaker, Keith Hotchkiss, for example, testified that these identical conditions are produced by the chemical action of embalming fluid. And when the doctors testified that the conditions found were produced by disease, and that the disease was present in such degree as to endanger the life of the deceased, they were in each instance but stating an opinion. And while, of course, the opinions of the trained pathologist and physician were entitled to due consideration, as being the conclusions of men trained in medical science, yet such opinions were not conclusive. Even when uncontradicted, the weighing of such testimony is peculiarly within the province of the jury. Jones on Evidence, Civil Cases (3d Ed.) § 390; Guinn v. Coates (Tex. Civ. App.) 67 S.W.(2d) 621; American Ins. Co. v. McKellar (Tex. Civ. App.) 295 S. W. 628. As said in Jones on Evidence, supra: "It is the inherent infirmity of expert testimony that it consists largely of matters of opinion. In addition to those elements of weakness and uncertainty which enter into the testimony of those who relate simply what they have seen and heard, we have in expert testimony the deductions and reasoning of the witness with all the chances of error incident to human reasoning." The rule applies with peculiar force to medical testimony for the reason that medical science, with all of its advancement in recent years, has not reached the point of being an exact science in many of its aspects. The human body is "fearfully and wonderfully made," and like conditions or infirmities do not always produce like results with different individuals. In this case the testimony of the doctors is replete with "ifs," "probabilities," and "assumptions."

The testimony of the company physician, Dr. English, to the effect that when he examined him some time before his death, deceased's blood pressure was above normal does not establish that such condition con-

tributed to his death. On the contrary, it may be inferred that Dr. English did not consider his condition such that following his usual work would endanger his life. Else, he would not have permitted him to continue work. Moreover, the fact stands out prominently that the deceased, to outward appearances, was a hale and hearty man who for eight years, without interruption, and up until the very moment he was stricken with heat exhaustion, had performed the arduous work in which he was engaged at the time of his death. Under all of the medical testimony it is at least possible, if not probable, that he could have continued to perform such work indefinitely had he not suffered the heat exhaustion which all witnesses agree was the immediate cause of his death.

█ Nor was the appellee denied recovery because the deceased voluntarily went into the tank car where he suffered the stroke. Appellant points out that the contract provides indemnity not for accidental death but for death produced solely by "accidental means," and contends that while the result, that is, the death of the deceased, was accidental in the sense that it was an unforeseen and fortuitous event, yet the means which produced it were not accidental. It is reasoned that the heat exhaustion followed in a usual and reasonably to be expected way from entering and working in the overheated tank car, and that since deceased did so voluntarily his death did not result from accidental means. The argument is not sound. It assumes that the deceased knew that the car was overheated and that he would probably suffer heat exhaustion from working in it. The facts do not justify such assumption. Deceased went to work about 8 o'clock. The car was standing in the sun. It is a reasonable inference that the air within it became hotter as the day advanced, and, since he was busily working inside, the deceased may not have been conscious of the extent of the increasing heat. He had done similar work for eight years with no apparent ill effects and it would be unreasonable to assume, as a matter of law, that he should have anticipated the heat exhaustion or that he would have voluntarily assumed such risk had he been aware of the danger. The heat exhaustion did not follow in a usual and reasonably to be expected way.

This question has been twice decided adversely to the contention of the defendant by our Supreme Court. Bryant v. Continental Casualty Co., 107 Tex. 582, 182 S. W. 673, 676, L. R. A. 1916E, 945, Ann. Cas. 1918A,

517; International Travelers' Ass'n v. Francis, 119 Tex. 1, 23 S.W.(2d) 282. In the Bryant Case death resulted from a sun stroke suffered while the deceased was walking upon the streets of the city of Houston in the ordinary course of his occupation as a collector of accounts. In discussing the contention that the death of the deceased did not result from accidental means because he was voluntarily upon the street in the hot sun, Chief Justice Phillips quoted with approval from United States Mutual Accident Ass'n v. Barry, 131 U. S. 100, 9 S. Ct. 755, 33 L. Ed. 60, the rule that "if a result is such as follows from ordinary means, voluntarily employed, in a not unusual or unexpected way, it cannot be called a result effected by accidental means; but * * * if, in the act which precedes the injury, something unforeseen, unexpected, unusual, occurs, which produces the injury, then the injury has resulted through accidental means." Judge Phillips then disposes of the contention as follows: "Upon the admitted facts, was the sunstroke suffered by Perry, the assured, under this clearly stated general rule, an accident? It was, undoubtedly. He was at the time walking the streets in the ordinary way, unconscious of any danger from the heat of the sun, as is to be plainly inferred from the stated facts, with apparently no apprehension of injury from that source, and a sunstroke suddenly befell him. True, his exposure to the sun was voluntary. But that does not conclude the question. Though the exposure be regarded as 'the means' of his injury,—to our minds an erroneous view,—and as purely voluntary, it cannot be said that the result was one following 'in a not unusual or unexpected way', from such means. On the contrary, in the course of the exposure, the act immediately preceding the injury, the sudden prostration occurred, not the usual happening under such circumstances in common experience, but having forcibly in its event the elements of 'something unforeseen, unexpected,' and out of the ordinary course."

We can see no difference whatever in principle in the case before us and the Bryant Case on this question. Here, as in that case, the deceased voluntarily exposed himself to the heat in that he went into the tank car voluntarily and in the course of his employment. The heat exhaustion which he suffered was, under the facts no more the usual happening under such circumstances than was the sun stroke in the cited case. It was " 'something unforeseen, unexpected,' and out of the ordinary course" and contrary to the

everyday experience of the deceased during the eight years he had followed that character of work. In International Travelers' Ass'n v. Francis, supra, Chief Justice Cureton, after reviewing many authorities bearing upon the question, reaffirmed the holding in the Bryant Case. We have no doubt that the heat stroke suffered by Funderburk fully satisfies the rule of "accidental means" thus laid down by our Supreme Court.

■■ Appellant's seventh, eighth, and ninth propositions are to the effect that appellee was not entitled to recover because she did not prove that she had submitted proof of accidental death of the insured to appellant as provided in the policy. The provisions of the policy relied upon are as follows: "Written notice of injury to any employee covered hereunder must be given to the Insurance Company within 20 days after the date of the accident causing injury. Affirmative proof of loss and that the same is covered under the Provisions of this Supplemental agreement and of the said Group Contract must be furnished to the Insurance Company within 90 days after the date of the loss for which claim is made."

The testimony of A. E. Hunt, who is connected with the Magnolia Petroleum Company, was to the effect that he promptly mailed notice and proof of Funderburk's death to the insurance company through the Magnolia's Dallas office, "the customary procedure in all cases." The point is made that it is not shown that notice and proof made claim for double indemnity. Even if the evidence does not warrant the inference that proper proof was made for double indemnity—in our opinion an erroneous view—still the assignments are without merit. In the first place the stipulations relied upon are in violation of article 5546, Vernon's Ann. Civ. St. in that the stipulation required the proof to be furnished within ninety days after date of the loss. American Surety Co. v. Blaine, 115 Tex. 147, 277 S. W. 619; Citizens', etc., Bank v. National Surety Co. (Tex. Com. App.) 258 S. W. 468; Francis v. International Travelers' Ass'n (Tex. Civ. App.) 260 S. W. 938; International Travelers' Ass'n v. Francis, 119 Tex. 1, 23 S.W.(2d) 282; Southern Travelers' Ass'n v. Masterson (Tex. Civ. App.) 48 S.W.(2d) 771; London & Lancashire Ins. Co. v. Higgins (Tex. Civ. App.) 68 S.W. (2d) 1056.

■ Moreover, appellant's assignment is without merit for another reason. Article 5546, Vernon's Ann. Civ. St., above cited, contains the further provision: "In any suit brought under this and the preceding article it shall be presumed that notice has been given unless the want of notice is especially pleaded under oath." Here the appellant filed no such plea, and under the authorities above cited, the conclusive presumption that notice or "proof" was given must be indulged. The holdings of the Dallas Court of Civil Appeals in the Francis Case were approved by the Supreme Court; see 119 Tex. 1, 23 S. W.(2d) 282.

■ The trial court did not err in admitting the photostatic copy of the group contract under which the deceased was insured. Upon the trial, plaintiff placed an attorney, J. B. Morris, on the stand who testified that the photostatic copy offered had been agreed to by the defendant's counsel in another case as a correct copy of said contract No. 103. Upon his testimony identifying it the trial court admitted the photostatic copy. The original of that contract was not in the possession of the plaintiff. In her petition plaintiff gave the defendant notice to produce the original of said group contract or secondary evidence of its contents would be offered. We deem it unnecessary to pass upon plaintiff's contention that said copy was admissible as an admission against interest. It was clearly admissible as secondary evidence. McDonald v. Hanks, 52 Tex. Civ. App. 140, 113 S. W. 604 (writ refused); Barclay v. Deyerle, 53 Tex. Civ. App. 236, 116 S. W. 123. The certificate which had been issued to the deceased under said group policy was introduced in evidence. It embodied the same provisions, to a large extent, that the group policy did, and made specific references to the group policy. These references fully identified said policy. The defendant does not contend here that the photostatic copy is not a true and correct copy of said contract 103, as it purports to be, or that it has been injured in any way by the admission of it. Since the defendant had full opportunity to make proof of the original contract and elected not to do so, it will not be heard to complain because the plaintiff proved it up by secondary evidence.

■ The submission of the following issue was not error: "Special Issue No. 3: Do you find from a preponderance of the evidence that the heat exhaustion sustained by the deceased, W. O. Funderburk, was accidental?"

The trial court properly defined the term "accidental" and no complaint is made of the definition. The contention is that the word "accidental" is a broader term than

"accidental means" and that the latter term should have been employed and defined. In the issue immediately preceding the one just quoted, and which has been set out in full above, the court inquired whether the death of the deceased "resulted solely, directly and independently of all other causes from the heat exhaustion he sustained." "Cause," as here used, was synonymous with "means." Bryant v. Continental Casualty Co., supra. Thus the court divided the issue of "accidental means" into its two fact elements, that is, first, whether the heat exhaustion was the means of death, and, second, whether such means was accidental. On the record before us that was a correct method of submission. Such submission rendered it wholly unnecessary to submit a charge embodying the legal definition of accidental means.

Finding no error, the judgment of the trial court is in all things affirmed.